IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 28, 2009

## STATE OF TENNESSEE v. RANDY JOE MCNEW

**Appeal from the Criminal Court for Sullivan County**
**No. S51,902     R. Jerry Beck, Judge**

---

**No. E2008-02189-CCA-R3-CD - Filed October 13, 2009**

---

A Sullivan County Criminal Court jury convicted the defendant, Randy Joe McNew, of driving after having been declared a motor vehicle habitual offender, *see* T.C.A. § 55-10-616 (2004), violating the vehicle registration law, *see id.* § 55-5-115, and driving under the influence, *see id.* § 55-10-401. The trial court imposed an effective sentence of four years to be served in the Department of Correction. On appeal, the defendant challenges the sufficiency of the convicting evidence, argues that a violation of the rule of sequestration rendered a State's witness incompetent to testify, claims that the trial court erred by refusing to rule prior to trial on the admissibility of evidence of the defendant's prior convictions, and attacks the sentencing decision of the trial court. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined. JOSEPH M. TIPTON, P.J., filed a concurring opinion.

J. Matthew King (on appeal and at trial), and Jason R. McClellan (at trial), Kingsport, Tennessee, for the appellant, Randy Joe McNew.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Brandon Haren and Julie Canter, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The convictions in this case arose from a February 3, 2006 vehicle accident at the home of Lori Akers on Ethel Beard Road in Sullivan County. Fifteen-year-old David Frazier testified that he was visiting the Ethel Beard Road residence along with several other teenagers when the defendant "pulled in the driveway" and, upon exiting his "greenish van," "chucked a beer bottle across the road." Mr. Frazier recalled seeing the defendant "staggering" toward the house. When the defendant stepped onto the porch, Mr. Frazier noticed that "[h]is eyes [were] bloodshot red and

he smelled of alcohol on his breath."  The defendant left the residence a short time later and then returned a second time approximately 45 minutes later.

After remaining at the residence a short time, the defendant got into his van to leave a second time.  Mr. Frazier recalled that the defendant "put it in '*Drive*' and hit Lori's van.  Then he put it in '*Reverse*' and backed up and hit . . . her van again."  Mr. Frazier testified that although he could not see inside the defendant's vehicle, he saw the defendant exit the van from the driver's side following the crash.

Mr. Frazier stated that he never saw the defendant's van being towed by either a tow truck or a private vehicle.

During cross-examination, Mr. Frazier stated that most of the people at the Ethel Beard Road residence were teenagers between the ages of 13 and 17; however, he denied that the residence was a place where teens "partied."  Mr. Frazier conceded that he had never seen the defendant before that evening and that he was unaware that the defendant suffered from back and leg problems.

Sullivan County Sheriff's Department Captain Jeff Cassidy testified that he responded to the Ethel Beard Road residence in a marked police car at approximately 7:30 p.m. "in reference to a minor wreck."  When Captain Cassidy arrived, the defendant "was standing [n]ear a van which had collided with a parked van at that residence."  Captain Cassidy recalled that the two vans occupied the entire driveway, requiring him to park his cruiser on Ethel Beard Road.  He stated that he observed less than $500 damage to the rear of Ms. Akers' van and very minor damage to the front bumper of the defendant's van.  A check of the defendant's license tag revealed that the tag was registered to a "[c]ompletely different person and vehicle."

According to Captain Cassidy, the defendant "had to lean up against the van to keep his feet steady" during the investigation.  After noting that the defendant had "slurred speech" and smelled of alcohol, Captain Cassidy asked the defendant to perform field sobriety tests.  Describing the odor of alcohol, Captain Cassidy said, "[Y]ou can tell when somebody's drunk a few beers and when somebody's been drinking all day.  And that was one of those that you could be probably four feet away from and still smell the odor."  The defendant refused to perform the field sobriety tests, saying that "he had back problems."  Following his observation of the defendant during the interview, Captain Cassidy placed him under arrest for driving under the influence ("DUI").

Captain Cassidy said he "[n]ever saw a tow truck, heard of anybody stating there was a [tow truck] except for [the defendant].  And all of the people at the residence didn't see a tow truck."  During the inventory search of the defendant's van, officers discovered "[t]hirteen (13) unopened Milwaukee beer cans and one empty can and a mattress and a box spring in the back part of the van."

When asked to submit to blood alcohol testing following his arrest, the defendant "not only refused to take the test, he refused to sign the refusal to take the test."  Captain Cassidy said the

defendant "was very adamant that he was not driving." According to Captain Cassidy, the defendant claimed that "[h]e had the vehicle towed to that residence."

During cross-examination, Captain Cassidy admitted that he never saw the defendant inside the van. He admitted that he had never seen either vehicle before and conceded that the damage to both vehicles was minor. He added, however, that "it was enough damage to where it couldn't have just rolled and bumped." Captain Cassidy said that he "didn't smell anything from" the teenagers at the Ethel Beard Road residence and that he "didn't notice any of them partying or anything like that." He admitted that he had been called to the Ethel Beard Road residence on more than one occasion to break up fights between juvenile visitors.

A stipulation of fact between the State and the defendant that was read to the jury provided:

> Comes the State of Tennessee, by and through its duly elected representative, H. Greeley Wells, Jr., District Attorney General for the Second Judicial District, and the Defendant, Randy J. McNew, and enters into this stipulation of fact on this 5th day of March 2008.
>
> On or about the 22nd day of February, 1990, Randy J. McNew was declared by the Criminal Court of Sullivan County to be an habitual traffic offender by order of the Honorable Edgar P. Calhoun, Judge, in Case #C23698.
>
> On February 3rd, 2006, the order declaring Randy J. McNew to be an habitual traffic offender remained in full force and effect.
>
> Signed Julie Canter, Assistant District Attorney; Matthew King, Attorney for the Defendant; and Randy J. McNew, Defendant.

Michael Clifton Dishner, the defendant's longtime partner in the scrap hauling business, testified that on February 3, 2006, he was at the Ethel Beard Road residence of his girlfriend, Lori Akers, when the defendant arrived at approximately 7:30 p.m. Mr. Dishner said, "A bunch of kids come running through the house hollering at Lori Akers that [the defendant] just hit the back of her van." Although Mr. Dishner heard no crash, he went outside where he saw a tow truck with a trailer driving away from the residence on Ethel Beard Road. He described the tow truck as "a regular pickup truck with a long trailer that you could pull a car on." He said that the defendant told him he had been dropped off by the tow truck and that the green van was a scrap vehicle for their business.

Mr. Dishner testified that Ms. Akers did not telephone 9-1-1 for "35, 40 minutes" after the accident and that it took officers nearly as long to arrive at the residence. He said that

during that time, the defendant, who had initially offered to pay for the damage to Ms. Akers' van, drank three or four beers. Mr. Dishner testified that Ms. Akers' van was in poor condition before the accident, explaining, "Door panels was falling off of it. Back bumper was cracked. Front bumper was cracked." He said that there was no change in the condition of the van after the accident.

Mr. Dishner stated that the defendant's medical condition prevented his performing field sobriety tests. He elaborated, "[W]ell, he's had broken legs and knees, ankles where his ex-wife has run over him; and he has some kind of a problem with his back."

According to Mr. Dishner, the Ethel Beard Road residence was a place where teenagers congregated to "party" nearly "every night." He stated that the teens, including Mr. Frazier, drank alcohol and smoked marijuana. He said he could not state with certainty, however, that any of the teens had ingested drugs or alcohol on the day of the offenses.

Captain Cassidy, recalled as a witness for the defense, testified that he did not know how long the defendant had been at the Ethel Beard Road residence prior to Captain Cassidy's arrival. During cross-examination by the State, however, he stated that it took officers only four minutes to respond to the 9-1-1 call. He reiterated that none of the juveniles present at the residence appeared to be under the influence of drugs or alcohol.

At the conclusion of the trial, the jury convicted the defendant of the offenses as charged.

### I. Sufficiency of the Evidence

The defendant claims that the State failed to establish beyond a reasonable doubt that the defendant was driving on the night of the offenses, thus rendering the evidence insufficient to support his convictions of driving under the influence and violation of a motor vehicle habitual offender order. The State submits that each conviction was supported by sufficient evidence.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view

of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

At the time of the offense in this case, Tennessee Code Annotated section 55-10-401 provided, in pertinent part, "It is unlawful for any person to drive or to be in physical control of any automobile . . . on any of the public roads and highways of the state . . . while . . .[u]nder the influence of any intoxicant . . . ." T.C.A. § 55-10-401(a)(1) (2004). Code section 55-10-613 provided that "if the court finds that the defendant is an habitual offender, the court shall make an order directing that the person shall not operate a motor vehicle on the highways of this state and that the person shall surrender to the court all licenses to operate a motor vehicle upon the highways of this state." *Id.* § 55-10-613(a). Following the motor vehicle habitual offender declaration, "[i]t is unlawful for any person to operate any motor vehicle in this state while the judgment or order of the court prohibiting the operation remains in effect," and "[a]ny person found to be an habitual offender under this part who thereafter is convicted of operating a motor vehicle in this state while the judgment or order of the court prohibiting such operation is in effect commits a Class E felony." *Id.* § 55-10-616.

The evidence adduced at trial, considered in the light most favorable to the State, established that the defendant, who was under a valid order declaring him to be a motor vehicle habitual offender, initially arrived at the Ethel Beard Road residence at approximately 6:30 p.m. driving a "greenish van." At that time, the defendant "stagger[ed]" onto the porch, and Mr. Frazier observed that the defendant's eyes were "bloodshot red" and that he smelled strongly of alcohol. The defendant left the residence but returned a short time later. Upon leaving the residence a second time, the defendant twice struck a van belonging to Lori Akers. Captain Cassidy testified that the defendant was unsteady on his feet, had bloodshot eyes, and smelled as if he had been drinking all day. Although Mr. Dishner testified that a tow truck dropped both the defendant and the van at the Ethel Beard Road residence and that the defendant began drinking only after he arrived at the residence, the jury was free to reject this testimony. The defendant suggests that this court revisit the credibility determination of the jury, stating that Mr. Frazier's testimony "was entirely inconsistent, not believable and admitted by him to be based upon faulty recollection." We remind the defendant that the jury, as the trier of fact, is the final arbiter of witness credibility. The jury, as was its prerogative, rejected the theory espoused by the defense and accredited the testimony offered by Mr. Frazier and Captain Cassidy. That testimony sufficiently established that the defendant drove the "greenish van" to the Ethel Beard Road residence while under the influence of alcohol and in violation of a motor vehicle habitual offender order.

## *II. Violation of Rule of Sequestration*

The defendant next contends that the trial court erred by permitting Mr. Frazier to testify after it found that Mr. Frazier's mother had violated the rule of sequestration by reporting to him on the progress of jury voir dire. The State contends that the trial court acted appropriately by

permitting the witness to testify because the defendant failed to establish that he was prejudiced by the communication between Mr. Frazier and his mother.

Rule 615 of the Tennessee Rules of Evidence governs the exclusion of witnesses during a trial or hearing:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

Tenn. R. Evid. 615. The rule is designed to prevent witnesses from hearing the testimony of other witnesses and subsequently adjusting their testimony. *State v. Harris*, 839 S.W.2d 54, 68 (Tenn. 1992). Rule 615 is mandatory and may be invoked at any time. *State v. Anthony*, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992).

Many sanctions exist for violations of the rule. In the most egregious case, the trial court may declare a mistrial. *Id.* Even when the trial court does not declare a mistrial, the witness may be cross-examined regarding the violation, and the jury may be instructed to consider the violation in assessing the witness' credibility. *Id.* "The trial court may, as a sanction, exclude the testimony of a witness who hears other testimony while subject to a sequestration order." *State v. Black*, 75 S.W.3d 422, 424 (Tenn. Crim. App. 2001). "The generally accepted procedure in Tennessee . . . is for the court to hold a jury-out hearing to determine both the facts of the violation and whether a party was prejudiced by the violation." Neil P. Cohen, et al., *Tennessee Law of Evidence* § 615 [11] [e] (4th ed. 2000). When a sequestration rule violation is raised on appeal, this court considers the seriousness of the violation and the prejudice, if any, suffered by the defendant. *Harris*, 839 S.W.2d at 68-69. In the face of a sequestration rule violation complaint, "[t]he decision to exclude or allow the testimony is a matter within the discretion of the trial court, subject to a showing of abuse and prejudice to the complaining party." *Black*, 75 S.W.3d at 424-25.

Here, the defendant requested the rule just before voir dire, and the violation of the rule occurred during voir dire of the jury. After being made aware of a potential violation of the rule, the trial court held a hearing outside the presence of the jury. At the hearing, James Allen Dishner testified that he saw David Frazier's mother, Linda Frazier, enter and exit the court room three or four times during voir dire. While outside the court room, she spoke with her son. On one

-6-

occasion, James Dishner overheard Ms. Frazier say something to Mr. Frazier "about asking the jurors about . . . trusting a 13-year-old's testimony."

Mr. Frazier insisted that his mother had told him nothing about the proceedings in the court room. During Mr. Frazier's testimony, however, the trial court noted that it had observed Ms. Frazier providing prompts to her son during his testimony and had her removed. The court stated, "The reason I had her leave the courtroom, you would ask a question of Mr. Frazier. Before he answered she would either give a shake of the [head] *'off'* or a shake of the head *'on,'* yes or no." Ms. Frazier denied telling her son what questions were being asked during voir dire.

At the conclusion of the jury-out hearing, the trial court ruled that Ms. Frazier "was violating the spirit of the Rule" but nevertheless concluded that there was no "great prejudicial effect that would require [it] to do a sanction, not allowing this boy to testify." Instead, the trial court ruled that Ms. Frazier would not be permitted to enter the court room for the remainder of the trial.

Under these circumstances, the trial court did not abuse its discretion by permitting Mr. Frazier to testify. The violation of the rule occurred during voir dire, thus Ms. Frazier had not had the opportunity to hear any witness testimony. Further, the record does not reveal that Ms. Frazier communicated any information to Mr. Frazier that would have caused him to alter his testimony. We fail to see how the defendant was prejudiced by the limited communication between Mr. Frazier and his mother, a spectator in the court room, during voir dire.

The defendant also argues that Mr. Frazier's testimony at the jury-out hearing rendered him incompetent as a witness. Because the defendant raises this issue for the first time on appeal, we will not consider it. *See State v. Adkisson*, 899 S.W.2d 626, 635; *State v. Matthews*, 805 S.W.2d 776, 781 (Tenn. Crim. App. 1990). Additionally, the defendant has failed to cite any authority for his argument that Mr. Frazier's actions rendered him incompetent to testify. *See* Tenn. Ct. Crim. App. R. 10(b).

### III.  *Defendant's Prior Convictions*

The defendant asserts that the trial court erred by refusing to make a pretrial ruling on the admissibility of his prior convictions as impeachment evidence. He argues that the court's failure to make a pretrial ruling prevented him from making "an informed decision on whether or not to forego testifying in his own defense and was therefore prejudiced under *Momon v. State*, 18 S.W.3d 15[2], 162 (Tenn. 1999)." The State contends that the defendant has waived this issue by failing to request a ruling on his motion at trial. In the alternative, the State submits that any error by the trial court was harmless.

Rule 609 of the Tennessee Rules of Evidence provides, in pertinent part, as follows:

For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:

(1) The witness must be asked about the conviction on cross-examination. If the witness denies having been convicted, the conviction may be established by public record. If the witness denies being the person named in the public record, identity may be established by other evidence.

. . . .

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

Tenn. R. Evid. 609(a).

In this case, the State filed a pretrial notice that it intended to use several of the defendant's prior convictions, including violating a motor vehicle habitual offender order, statutory rape, theft under $500, and secreting the property of another, as impeachment evidence should he decide to testify at trial. Later, the defendant moved the trial court to rule on the admissibility of the convictions as impeachment evidence prior to trial. At a pretrial motions hearing, the trial court held that the defendant's motion was "premature" and declined to hear the motion at that time. The trial court noted, however, that the motion "remains filed" and stated that it was "not denying" the motion but was instead deferring ruling to "just before the [d]efendant decides to" testify. The trial judge admonished defense counsel to "alert [him] at the trial," and defense counsel agreed to "raise it again . . . at the appropriate time." Despite this assurance, defense counsel failed to request a ruling on the motion at trial. Later, during the hearing on the motion for new trial, counsel acknowledged his failure and attributed it to the fact that the defendant had "already made up his mind he was not going to testify." Counsel elaborated, "And then when . . . it came time to make the decision . . . we felt [a ruling] wasn't needed [be]cause he had already made up his mind he wasn't taking the stand."

Thus, the record establishes that although the trial court refused to rule on the defendant's motion prior to trial, it agreed to consider the issue when raised again by the defendant at trial. Defense counsel did not raise the issue again and conceded at the hearing on the motion for new trial that a ruling on the motion became unnecessary because the defendant had elected not to testify. Because the defendant failed to raise the issue at trial, he cannot now complain that he was harmed by the trial court's pretrial refusal to hear the motion. "[A] party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error" is not entitled to relief on appeal. Tenn. R. App. P. 36(a).

-8-

*IV. Sentencing*

In his final issue, the defendant challenges the sentencing decision of the trial court, arguing that the trial court failed to properly weigh the enhancement and mitigating factors and that the trial court erred by denying alternative sentencing. The State submits that the sentence was appropriate.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court must consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

At the July 24, 2008 sentencing hearing, Virgil Larry Francisco testified that the defendant was living in a "building" on his property and could continue to do so should he be released on probation. Mr. Francisco stated that he had known the defendant most of the defendant's life and that the defendant was a "good person" who "has a[n] alcohol problem." According to Mr.

Francisco, the defendant had a hard time getting his driver's license reinstated because "he can't get a birth certificate. I don't know if he's ever registered as even being born." Mr. Francisco stated that the defendant was a good worker and described the defendant as "industrious . . . if he has his alcohol under control." He said that the defendant had always managed to support himself financially. He testified that the defendant's health had deteriorated since the offenses in this case.

Laura Lane testified that the defendant had worked for her for a number of years in her logging business. She said that the defendant was a good, dependable employee. Ms. Lane stated that she was willing to provide the defendant with transportation to a recovery program and with a job should he be released on probation.

The 41-year-old defendant testified that he began drinking alcohol at age 15 and had continued to do so on a regular basis. He admitted having a problem with alcohol addiction and asked the trial court to place him in an alcohol rehabilitation program. The defendant stated that he suffered from serious health issues, explaining, "I got that pancreatic cancer down here in my lower part. I got two heart murmurs. I was born with those. I had a . . . mild heart attack last November and was bleeding out . . . from my stomach."

At the conclusion of the hearing, the trial court enhanced the defendant's sentence on the basis of the his lengthy criminal history, which included eight previous convictions of driving under the influence, 11 convictions of public intoxication, three convictions of traffic offenses, two convictions of theft, two convictions of vandalism, two convictions of driving on a revoked license, two convictions of violating a motor vehicle habitual offender order, and single convictions for shoplifting, criminal trespass, domestic violence, assault, possession of drug paraphernalia, possession of marijuana, and statutory rape. *See* T.C.A. § 40-35-114(1) (allowing sentence enhancement on the basis of a defendant's previous criminal convictions). The trial court considered as mitigating factors the defendant's poor health and his consistent work history. Based upon these findings, the trial court imposed a Range II sentence of four years for the violation of the motor vehicle habitual offender order and 11 months and 29 days for DUI. The court ordered the defendant to serve the minimum of 48 hours' incarceration for his conviction of DUI.

The trial court also denied probation and all other forms of alternative sentencing, stating, "Release in the community has not benefitted him. I don't see why it would benefit him this time." The court noted the defendant's numerous previous probationary placements and concluded that the defendant's record was "too bad" for another probationary placement.

## A. Length of Sentence

The defendant first complains that "[t]he trial court failed to properly balance appropriate enhancement and mitigation factors as is required by law." The State correctly points out that this is not a valid claim on appeal. Prior to 2005, Code section 40-35-401 provided for an appeal on grounds that "[t]he enhancement and mitigating factors were not weighed properly, and the sentence is excessive under the sentencing considerations set out in § 40-35-103." *Id.* § 40-35-401(b)(2) (2003). The 2005 amendments to the Sentencing Act removed this provision, and the Code no longer provides for appellate review of the weight assigned to the now advisory

enhancement and mitigating factors. *See id.* § 40-35-401(b)(1)-(3) (designating grounds for appeal of a sentence).

## B. *Denial of Alternative Sentencing*

The defendant complains that the trial court erred by denying probation or other alternative sentencing because he "demonstrated probation and/or alternative sentencing will, 'subserve the ends of justice and the best interest of both the public and the defendant.'" The State submits that the trial court properly ordered a fully incarcerative sentence.

As the recipient of a Class E felony conviction, the defendant is considered a favorable candidate for alternative sentencing. T.C.A. § 40-35-102(6) (2006). "[F]avorable status consideration," however, does not equate to a presumption of such status. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008). Rather, sentencing issues are determined by the facts and circumstances presented in each case. *State v. Taylor*, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987). As the recipient of a sentence of ten years or less, the defendant is also eligible for probation. *See* T.C.A. § 40-35-303(a).[1] The defendant bore the burden of showing that he was entitled to probation. *See, e.g.*, *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999) (holding that defendant bears the burden of establishing his "suitability for full probation").

In this case, the trial court cited the defendant's "bad" criminal record and his previous history of sentences involving probation as reasons for its denial of probation and other alternative sentencing. The record established that the defendant had more than 30 prior convictions, many of which included a sentence involving release into the community and more than half of which were similar to the offenses in this case. Given the extensive nature of the defendant's criminal record and his failure to be rehabilitated by repeated probationary placements, the trial court did not err by denying probation or other alternative sentencing.

## *Conclusion*

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

---

[1]Although Code section 55-10-616 provides that "[t]he court has no power to suspend any such sentence or fine, except . . . in cases where the operation is necessitated in situations of apparent extreme emergency that require the operation to save life or limb," *see* T.C.A. § 55-10-616(c), this court has held that passage of the 1989 Sentencing Act repealed this provision by implication, *see State v. Martin*, 146 S.W.3d 64, 76 (Tenn. Crim. App. 2004).